287 N.J. Super. 59 (1995)
670 A.2d 548
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-APPELLANT,
v.
JOHN VAN NORTWICK, DEFENDANT-RESPONDENT, AND ROBERT W. BLISS; ELLA R. BLISS; UNITED JERSEY BANK/MID STATE, A BANKING INSTITUTION OF NEW JERSEY; DRAZIN & WARSHAW, ESQS.; TOWNSHIP OF DOVER, IN THE COUNTY OF OCEAN, A MUNICIPAL CORPORATION IN NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1995.
Decided July 20, 1995.
*62 Before Judges MUIR, Jr., D'ANNUNZIO and EICHEN.
Lorinda Lasus argued the cause for appellant (Deborah T. Poritz, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel, Ms. Lasus, Deputy Attorney General, on the brief).
John H. Buonocore, Jr. argued the cause for respondent (McKirdy & Riskin, P.A., attorneys; Mr. Buonocore, of counsel and on the brief).
The opinion of the court was delivered by EICHEN, J.S.C. (temporarily assigned).
This condemnation case, which we review for the second time, involves the acquisition of part of property owned by defendant John Van Nortwick (defendant) for the Department of Transportation's Route 37 highway improvement project in Dover Township, Ocean County.
In State, by Comm'r of Transp. v. Van Nortwick, 260 N.J. Super. 555, 617 A.2d 284 (App.Div. 1992), we held the trial judge's failure to exclude evidence of the diminution of access to a fronting highway as an element of damages was reversible error. There, we were confronted with the question of whether the diminution of access is compensable in the context of a partial taking where the remaining access is reasonable. We determined that it was not compensable, reversed the judgment in favor of defendant and remanded the case for trial. In that context, we observed as dicta, that "a diminution of access may cause other conditions on *63 the property itself which may be compensable, as for example, ... such things as limitation of design options or on-site maneuverability, ...." Id. at 558, 617 A.2d 284.
At the retrial following our remand, the trial judge allowed defendant's expert, Anthony S. Graziano, to testify concerning the loss in value to defendant's remaining land occasioned by the relocation of access, specifically the loss of on-site vehicular maneuverability and building design options. Graziano had given similar testimony at the first trial. Prior to the second trial, the State sought to exclude this evidence arguing that the loss of on-site vehicular maneuverability and limitation on building design option were not compensable because they were the direct result of diminution of access and unless the substitute access was unreasonable there could be no recovery for this type of damage especially where the land was only hypothetically vacant.
Defendant responded that this court had not decided the question of whether defendant was entitled to damages to the remaining property caused by the limitation of access. He argued that on appeal from the first trial, the only evidence we had ordered excluded from jury consideration was evidence of damages attributable to the "diminution in access per se," i.e., damages arising from off-site impact. The State then retorted that because Graziano, defendant's expert, was unable to separate the damages related to on property conditions from off-site impact (diminution of access per se), all of his expert opinion testimony on damages should be ruled inadmissible.
Judge Kannen concluded we had not considered or decided the issue of defendant's entitlement to compensation for on-site impact caused by the diminution of access. We agree. The judge also correctly held that any such on-site impact was compensable as part of severance damages and that a properly instructed jury may be presented with evidence that allows it to separate the compensable on-site damage from the impermissible diminution per se damages. The judge concluded the jury would have to be instructed not to consider the "diminution per se" damages in *64 their calculations, but that limitations such as loss of building design options and limitations on vehicular maneuverability are proper elements of severance damages and should be considered. We agree with Judge Kannen's analysis and affirm.
The facts were amply set forth in our opinion, 260 N.J. Super., supra, at 555, 617 A.2d 284, but bear some repetition and amplification. The property is in a rural highway business zone and is used by defendant to run a tour bus company. Permitted uses in this zone include retail, wholesale and personal service establishments, offices, banks, restaurants, vocational schools and research labs. Three structures existed on the property as of the date of taking, a one-story metal building, used as a garage, a two-and-a-half-story masonry building, and a one-story masonry dwelling, the oldest of which is more than eighty years old. In connection with the highway improvement project the State took a 28 1/2 foot strip of land across the entire frontage for construction of a deceleration lane and an exit ramp. Before the taking, defendant's land had access to Route 37 through its full 328 foot frontage. After the taking, access is limited to 140 feet at the easterly end of the property. In addition, the depth of the property was reduced by the taking so as to require a variance for any future development, and the buildable area was effectively reduced by 22%. The taking of the 28 1/2 foot strip of land across the entire frontage did not affect the buildings on defendant's property.
The record reflects the most significant impact the taking would have on the property would be in terms of its depth. Most notably, whereas before the taking, the 220-foot depth met the minimum zoning requirement of 200 feet, after the taking a variance would be needed because the remaining property was only 191 feet deep on one side and 159 feet deep on the other.
Also significant was the impact on the amount of buildable area. The record discloses before the taking, the buildable area was 19,000 square feet, which reduced to only 14,399 square feet because of the twenty percent maximum requirement for lot *65 coverage. After the taking, one could get only 11,276 square feet of buildable area, for a net loss of 3200 square feet, or 22%  even though the State took only 14% of the property. This was a net loss, in the utility of the property, over and above the loss of the land. Of course, the larger the buildable area, the more valuable the land. A potential builder would have to be content with constructing a very long, narrow building that was, in fact, less than the allowed 20% of lot coverage.
William T. Burke, the State's expert, testified that the highest and best use of this property  defined as a use that is both legally permitted and physically possible, which will provide the highest net return to the owner  is highway-oriented commercial use, the use, he testified, to which the property is currently being devoted. Burke testified defendant was entitled to be compensated for such elements of damages as on-site maneuverability problems occasioned by the limitation of access, and the moving of certain areas which had formerly housed parking and loading space. This opinion was based on appraising the damage to the land as improved property, not vacant land. On cross-examination, initially Burke noted that on vacant land there would be no problem with on-site maneuverability. Later, he conceded that in the hypothetical case of vacant land, limiting vehicle access to the eastern half of the property could cause problems in terms of future building, "required parking, the parking flow, and so forth," acknowledging the vacant property would be worth $74,400 less with the limited access because of loss of "maneuverability for parking layouts as well as building alignment," among other things. After adjusting downward the damages caused by noncompliance diminution per se damages, Burke arrived at a just compensation amount for the taking of $84,600.
Graziano testified as defendant's real estate expert. He also concluded the highest and best use for this property would be commercial development, but as a vacant lot, not in its present use, because of the high value of the land, its location in the intensely developed commercial district of Route 37 and the *66 advanced age of the on-site improvements. Considering its higher value as vacant land, Burke testified it would be absurd to continue the existing use of the property. Hence, he opined, the improvements should be demolished and the property redeveloped in accordance with its commercial character.
Graziano also testified the limitation of on-site vehicular maneuverability is caused, not by the denial of access to the highway per se, but the location and method of the access. The record reflects the permitted access here was a single driveway on the extreme easterly side of the property. Because drivers could not loop in one driveway and out another, Graziano testified, they would have to double back to the same driveway on which they entered. To allow for this double-backing of traffic on the property, he concluded a builder would need 24-foot-wide drive aisles.
In quantifying the damages, Graziano estimated a 10 to 15% adjustment for each of the following: the need for a depth variance; the loss of buildable areas; the loss of design flexibility; and finally a 5 to 10% adjustment because of the limitation of on-site maneuverability. The total negative impact, he concluded, was 30 to 50% and, using the more conservative 30% figure, he arrived at a lump sum figure of $242,000 as the total damages.
On cross-examination, Graziano admitted that, even though he broke down his after-taking damages into these four separate components, they all had a common thread, i.e., diminution of access. He testified for that reason he used the lower percentage figure of only 30% to account for the overlapping. In Graziano's view, it was not the denial of access to the property that caused these damages, but the permission of access on only the easterly end. The same was true of the on-site maneuverability damages  they were tied to the location of the permitted access.
Graziano estimated, as he had at the first trial, that of his $242,000 total damages, $85,900 represented damages for the land taken and $156,100 represented severance damages to the land that remained. He testified no portion of the $156,100 was attributable to the diminution in access from 328 feet to 140 feet; *67 rather, he opined, it was a function of the location of the permitted access which remained. Graziano admitted, however, that at the first trial, when asked whether any of his estimated damages were attributable to the diminution in access, he had answered yes. He also admitted he had been unable to break down the total damage figure at the first trial, but that a portion of it was attributable to the diminution in access from 328 feet to 140 feet. Graziano explained the contradiction by noting that his answer changed due to the intervening appeal which had decided certain legal questions concerning "what constitutes the limitations of ... access."
At the conclusion of the trial, the State moved to strike Graziano's testimony based on the conflicting testimony. The judge denied the motion, determining the jury would evaluate his credibility.
The judge charged the jury that defendant was entitled to receive the fair market value for any use for which his property had "value in the immediate present or in reasonable anticipation in the near future." The judge defined fair market value and highest and best use and told the jury it should decide which expert's testimony to accept.
The judge also told the jury that, as long as the remaining access on site (in terms of reaching the property from the highway and returning to the highway from the property) was reasonable, the diminution in access per se would not be compensable. An owner was not entitled to access along each and every point of his frontage, only to free and convenient access. Where access was limited but remained reasonable, there could be no compensation for diminution per se. Both sides here had agreed that the remaining access was reasonable.
The judge also explained that both sides had agreed that the taking had reduced the value of the property that remained, but that they disagreed as to the extent of this reduction. He told the jury that although the law did not recognize as compensable any damages caused by the reduction of access per se, defendant could be compensated for the real effect on his property of such things *68 as design flexibility or traffic maneuverability caused by the restriction of his ingress and egress. The judge explained, however, these effects would have to be shown to be actual with respect to this particular property, and not merely generalized, speculative or hypothetical: that is, it had to be shown that the loss occurred on this specific property, and this loss had to be separated from the loss of value caused by the restriction of ingress and egress per se.
The judge's charge on the access damage issue was as follows:
Now, the factor of access came in and let's talk about that. We know as fact, we know the frontage of the property which was over 300 feet, we know that the access was blocked off on a certain portion of it, and that there was 140 feet left for access to the property. It's important you understand what is meant by the term "access and diminution of access." As long as the remaining access in terms of the means of reaching the property along the highway and returning to the property or to the highway from the property is reasonable, the diminution in access per se is not compensable. For example, highway improvements which create the necessity to follow a more circuitous or inconvenient route to reach the property from the highway is not compensable unless it's unreasonable. Highway improvements which merely divert traffic away from a property without affecting the owner's ability to use his or her property are similarly not compensable. The owner of a property is not entitled to access along each and every point of his or her frontage, but the owner is entitled to free and convenient access to his or her property and the improvements on it. Where access is limited but remains reasonable, the owner is not entitled to compensation for the diminution of access per se.

In this case both appraisers agree that the width of the area where vehicular ingress and egress will be permitted after the taking is reasonable; that is, they agree that a vehicle has adequate room to get on and off the property, that it is reasonable for cars to get on and off the property through the remaining 140 feet.
The State's expert who valued the property on the basis of that its existing use was the highest and best use found the value of the remaining property reduced as a result of on-site conditions created by the taking. The owner's expert who valued the property on the basis that its highest and best use was for redevelopment with the use permitted by zoning also found that the value of the remaining property was reduced as a result of on-site conditions created by the taking. The experts disagree, however, on the extent to which the value of the remaining property was reduced or diminished as a result of on-site conditions created by the taking. It is up to you to determine the existence and amount by which the value of the remaining property was reduced or diminished as a result of on-site conditions created by the taking, and you will consider such factors, if any, in arriving at your value of the property after the taking in ultimately your award of compensation. Just talking a little more about access since it was referred to by everyone, by both attorneys and the appraisers, that the Van Nortwick property had 328 feet of *69 frontage with no restriction of access. After the acquisition, it was left with 140 of accessible frontage which both appraisers did agree as they indicated is reasonable. The law is that an owner is not entitled to access from an adjacent highway at each and every point of his or her property, but only to free and convenient access to his or her property and the improvements on it.
Reasonable highway regulations will not give the rise to a claim for a compensable taking; thus, the law recognizes that a property may be damaged by the reduction of access per se, but holds that such damages are not compensable. This noncompensability for the diminution of access per se when the remaining access is reasonable does not occur because there has not in a real sense been a taking  does not occur not because there hadn't been in a real sense a taking or doesn't diminish the value of the landowner's property, but because as a matter of public policy we don't compensate for such losses.
This conclusion recognizes that there may have been a taking in a real sense as far as this limitation of ingress and egress to a certain point and that there may have been a diminution in the value of landowner's property, but such compensation for such loss is not compensable due to a matter of public policy. Provided that the remaining access is reasonable, damage that may be sustained because a change or diminution of that access does not constitute an element of damage to the land and it's not compensable; however, if as a result of restricted ingress and egress, there is a real or genuine effect on the property because of such things as design flexibility or traffic maneuverability because of the characteristics of the property or the particular property such as it's size or it's shape, these items can be properly considered in determining compensation. You should be cautioned, however, that such restrictions in the use of the property must be shown to be actual in this particular property and not generalized, speculative or hypothetical conclusions which might affect any property as a restriction of access might always be claimed to affect traffic flow within the property or design flexibility upon property in that location of ingress and egress could always be said to effect in some way the property and how it's developed.
In order to allow for compensation for loss it must be shown that a loss has occurred on this specific piece of property because, as I said, if its characteristics such as its size or its shape that has been left after the taking, and this must be separated from the loss of value because of a restriction of ingress and egress per se.

The jury returned a verdict of $150,225.

II.
This case involves a partial taking of land, including issues involving diminution of access to the land. It is not a typical "highway access" case where the property owner complains that the limitations on access causes inconveniences or business losses by the resulting need to follow a more circuitous route. State of *70 N.J. by Comm'r of Transp. v. Monmouth Hills, Inc., 110 N.J. Super. 449, 452, 266 A.2d 133 (App.Div.), certif. denied, 57 N.J. 133, 270 A.2d 36 (1970); State of N.J. by Comm'r of Transp. v. Charles Inv. Corp., 143 N.J. Super. 541, 544, 363 A.2d 944 (Law Div. 1976), aff'd o.b., 151 N.J. Super. 14, 376 A.2d 534 (App.Div. 1977), aff'd o.b., 76 N.J. 86, 385 A.2d 1227 (1978). Nor is this a case in which the parties dispute the reasonableness of the remaining access. High Horizons Development Co. v. State Dept. of Transp., 120 N.J. 40, 48, 575 A.2d 1360 (1990); see also Com'r of Transp. v. Nat. Amusements, 244 N.J. Super. 219, 581 A.2d 1353 (App.Div. 1990), certif. denied, 127 N.J. 327, 604 A.2d 601 (1991); see also Lima & Sons, Inc. v. Borough of Ramsey, 269 N.J. Super. 469, 635 A.2d 1007 (App.Div. 1994). These cases do not address the precise issue before us, i.e., whether a property owner is entitled to just compensation for on-site damages to his remaining property caused by the manner in which his access was limited.
When the State exercises its power to take private property under the Eminent Domain Act, N.J.S.A. 20:3-1 to -50, it must pay just compensation for the property taken. N.J. Const. art. I, ¶ 20. Just compensation is defined as the fair market value of the property as of the date of the taking, determined by what a willing buyer and willing seller would agree to, neither being under any compulsion to act. State of N.J. by Comm'r of Transp. v. Caoili, 135 N.J. 252, 260, 639 A.2d 275 (1994); State of N.J. by Comm'r of Transp. v. Silver, 92 N.J. 507, 513, 457 A.2d 463 (1983). It is the value that would be assigned to the property by knowledgeable parties freely negotiating under normal market conditions based on all the surrounding circumstances at the time of taking. State v. Caoili, supra, 135 N.J. at 260, 639 A.2d 275; State v. Silver, supra, 92 N.J. at 514, 457 A.2d 463.
Most relevant in determining fair market value is the property's highest and best use, which must be considered in light of the applicable zoning restrictions. Courts should show considerable latitude in admitting evidence of market value, and the evidence may encompass all relevant facts, including those that *71 have a bearing on the available future use of the property. Caoili, supra, 135 N.J. at 260-61, 639 A.2d 275; Silver, supra, 92 N.J. at 515, 457 A.2d 463. That is, for condemnation purposes, market value is not limited to the value of the use to which the land is actually developed. Rather, an "owner [should] receive the fair market value of the land for any use for which it has commercial value in the immediate present or in reasonable anticipation in the near future." State v. Gorga, 26 N.J. 113, 116, 138 A.2d 833 (1958), quoted in State of N.J. by Comm'r of Transp. v. Hope Rd. Assocs., 266 N.J. Super. 633, 642, 630 A.2d 387 (App.Div. 1993), certif. granted and judgment modified on other grounds, 136 N.J. 27, 641 A.2d 1038 (1994).
Where only a portion of the property is condemned, "the measure of damages includes both the value of the portion ... actually taken and the value by which the remaining land has been diminished as a consequence of the partial taking." Silver, supra, 92 N.J. at 514, 457 A.2d 463. These latter damages are known as severance damages, and are the ones at issue in this case. Ibid.; State of N.J. by Comm'r of Transp. v. Faps Realty Corp., 197 N.J. Super. 44, 47, 484 A.2d 35 (App.Div. 1984); State of N.J. by Comm'r of Transp. v. Cooper Alloy Corp., 136 N.J. Super. 560, 567-68, 347 A.2d 365 (App.Div. 1975). In the case of such a partial taking, the court's inquiry is broader than when the entire parcel is taken. An examination of all characteristics of the property remaining after the taking, opposed to those facts in existence at or before the taking, is inescapable. Silver, supra, 92 N.J. at 515, 457 A.2d 463. A wide factual inquiry should be allowed into all material facts and circumstances, past and prospective, that would influence a buyer or seller interested in consummating the sale. Ibid.; Village of S. Orange v. Alden Corp., 71 N.J. 362, 368, 365 A.2d 469 (1976).
However, not all losses suffered by a condemnee are compensable. For example, damages of a speculative nature are not compensable, nor are losses incidental to a taking, such as destruction of good will, lost profits, inability to relocate, or *72 frustration of plans. Those items are seen as being peculiar to the owner as opposed to being directly attributable to the realty. State v. Cooper Alloy, supra, 136 N.J. Super. at 568, 347 A.2d 365.
For example, in Middlesex Cty. v. Clearwater Village, Inc., 163 N.J. Super. 166, 394 A.2d 390 (App.Div. 1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979), it was held that it was error to award severance damages based on a property owner's future plans which would entail lost profits or income because the owner would have fewer units from which he could derive the cost of his common facilities. According to this court, this loss did not affect the land value of the remainder that was not taken; rather, it was simply a business problem. Id. 163 N.J. Super. at 177, 394 A.2d 390.
By contrast, in State of N.J. by Comm'r of Transp. v. Inhabitants of Town of Phillipsburg, 240 N.J. Super. 529, 573 A.2d 953 (App.Div. 1990), the State had contended that a portion of the defendant's remainder damages should have been stricken as a matter of law because it constituted non-compensable damages for the inconvenience caused by having to follow a more circuitous route. This court rejected that argument, holding that where the construction of the state highway had cut off one portion of the remainder of the property from another, the problem was not one solely of rerouting traffic. Rather, utilities could not be installed across the highway, except by an expensive tunneling method, and so the State's taking had affected the ability of potential developers to develop the land. Id. at 547-48, 573 A.2d 953.
The present case is more akin to Phillipsburg than it is to Clearwater. Defendant's claim for severance damages included a claim that a potential developer would pay less for this land, not just because there was a smaller piece of land remaining (for which defendant was being separately compensated), and not just because access to his property from the highway would be limited (which the law did not recognize as compensable), but because the restriction and location of the limited access, combined with the prevailing zoning requirements in the town, caused his property to *73 be less useful and less valuable in terms of its highest and best use.
In this case, if the jury accepted that the highest and best use of the land was as a commercial development with the existing improvements demolished, then there was ample credible testimony before it that a potential commercial developer would be restricted in the size and shape of the structure he could build on the property, and in the number of units he could build. This is because room would have to be allowed for wider driving aisles on the property to permit cars to double back and exit from the same driveway they entered. That double-backing was directly due to the fact that the State had not only decreased the amount of defendant's access but also changed the location of it.
Moreover, the jury was quite properly instructed here to consider these on-site damages occasioned by the lack of access only if they were convinced that they were actual and specific to this property. That is, they were cautioned not to award generalized, speculative or hypothetical damages. Most significantly, they were emphatically instructed not to award damages for any limitation of access per se. Given this well-instructed jury, we believe that the allowance of defendant's expert's testimony was proper.
Nevertheless, the State contends that because defendant's expert could not separate out his access per se damages from his on-site damages, all of his testimony should have been stricken, citing State v. Faps Realty, supra, 197 N.J. Super. at 48, 484 A.2d 35. Faps is distinguishable. In Faps, before the taking, there had been no access restrictions on the defendant's property. Cars could go directly into the property and park in front of the buildings. Moreover, they could also use some 20 feet of State-owned property to maneuver. The effect of the taking was to eliminate the ability of cars to enter and exit at any point. Instead of uncontrolled access, there was to now be three separate driveways. This change in access also prevented the use of State land for maneuvering room. In addition, the taking reduced the *74 distance from the existing buildings to the edge of the highway. Id. at 47, 484 A.2d 35.
The combined effect of the taking and the change in access was to reduce the distance available to park cars from 48 feet to 17 feet. However, a mere taking without the access change would have still left 44 feet, which was all that was needed for maneuvering a car to park. Id. at 47-48, 484 A.2d 35.
The defendant's expert conceded that the State's control of access to the property had played a part in his computation of severance damages, but he could not separate out the effect that the change in access alone had on his computation. Id. at 48, 484 A.2d 35. Because the owner was not entitled to be compensated either for the limitation of access or for the loss of use of the State's own previously owned property, and because that had been the primary cause of the loss of vehicular maneuverability, this court held that the defendant's expert's testimony should have been stricken. Ibid. We concluded his opinion was not competent evidence because it included both compensable and non-compensable items which he could not segregate and which did not permit the fact-finder to separate the proper from the improper. Ibid.
The loss of on-site maneuverability which occurred in Faps was due to the State's change in use of its own property which had previously been made available to the patrons of the property owner. Not so here. Moreover, defendant's expert did separate out his non-compensable items from the compensable ones when he testified at the second trial that no portion of his severance damages of $156,100 were attributable to the limitation of access per se. While this is the opposite of what he had said at the first trial, where he had been unable to identify what portion of this amount was attributable to access per se, the jury heard this change in his testimony and, during the State's cross-examination of Graziano, his credibility was challenged when confronted with the contradiction. Apparently, the jury chose to discredit some of Graziano's testimony because it did not award defendant the full *75 $242,000 which the witness had calculated. Using Graziano's own calculations, the jury may have simply discounted an amount that it felt was attributable to the limitation of access per se, which, of course, it was free to do.
In any event, even if Graziano's opinion may have included both compensable and non-compensable items which he did not separate, the evidence was sufficiently competent "to permit the factfinder to separate [] the proper from the improper...." Id. at 48, 484 A.2d 35.
We recall Judge Baime's comments in Dubak v. Burdette Tomlin Memorial, 233 N.J. Super. 441, 559 A.2d 424 (App.Div.), certif. denied, 117 N.J. 48, 563 A.2d 817 (1989), a case in which we refused to set aside a jury's verdict. We said:
We come then to an old topic  one upon which reasonable persons often differ  the ability of the jury to find the facts and do justice in light of the evidence. It has been said that courts "are ambivalent in their estimate of the intelligence of the layman, summoning one line of cases and then another to support the varying moods of their decisions." [citations omitted.] To some, resolution of that question depends upon "whether one views the jury as composed of twelve [persons] of average intelligence or twelve [persons] of average ignorance." [citation omitted.] Whatever else may be said, it is clear that the jury in this case was unusually astute and perceptive. We find no justifiable reason to set aside the verdict in the circumstances of this case.
[Id. 233 N.J. Super. at 460, 559 A.2d 424].
Finally, we reject the State's argument that these on-site damages cannot be awarded to a property owner whose land is vacant because it would permit a jury to consider hypothetical improvements to vacant land and to speculate as to how the access restriction would affect such abstract improvements. As previously noted, a property owner may be compensated for the highest and best use of his land, which may include a use to which the property is not currently being put. As long as the use is legally permitted, physically possible, and reasonably anticipated in the near future, a jury can base its fair market value determination on that use. Here, there was ample credible testimony that it would be absurd to leave, as is this valuable piece of property in the prime commercial district, and that its highest and best use would *76 be as a commercial development. Defendant's expert's proposed example of a storefront development where the stores would have to be built "long and thin" was a reasonable explanation of how the restricted access would, in the near future, affect this particular parcel of property. More importantly, it was a factor which a reasonable buyer would deem relevant in calculating the fair market value of this property.
Affirmed.